# EXHIBIT 3

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| **QUICKEN LOANS INC.** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. _____** |
| | § | |
| **RE/MAX, LLC.** | § | |
| | § | |
| **Defendant.** | § | |

### PLAINTIFF QUICKEN LOANS INC.'S COMPLAINT

Plaintiff, Quicken Loans Inc. ("Quicken Loans"), files this Complaint against Defendant,

RE/MAX, LLC ("RE/MAX" or "Franchisor"), and states:

### PARTIES

1.     Plaintiff, Quicken Loans, is a corporation that is incorporated under the laws of

the State of Michigan.  Quicken Loans has its principal place of business in the State of

Michigan, located at 1050 Woodward Avenue, Detroit, Michigan 48226.

2.     Defendant, RE/MAX, LLC, is a limited liability company organized under the

laws of the State of Delaware.  RE/MAX has its principal place of business in the State of

Colorado, located at 5075 South Syracuse Street, Denver, Colorado 80237.  RE/MAX may be

served with process by serving its registered agent, Geoffery D. Lewis, located at 5075 South

Syracuse Street, Denver, Colorado 80237.

### JURISDICTION AND VENUE

3.     Under 28 U.S.C. § 1332, the Court has subject matter jurisdiction because this

action is between citizens of different states and the amount in controversy exceeds $75,000,

exclusive of interest and costs.

---

4.      Quicken Loans is a citizen of the State of Michigan because it is incorporated and has its principal place of business in the State of Michigan.

5.      RE/MAX is a limited liability company and a wholly-owned subsidiary of RMCO, LLC, whose members are RE/MAX Holdings, Inc. and RIHI, Inc.  RE/MAX Holdings, Inc. is a corporation incorporated under the laws of the State of Delaware with its principal place of business located at 5075 South Syracuse Street, Denver, Colorado 80237.  RIHI, Inc. is a corporation incorporated under the laws of the State of Delaware with its principal place of business located at 5075 South Syracuse Street, Denver, Colorado 80237.  Because the citizenship of a limited liability company is determined by the citizenship of each member of the entity, RE/MAX is a citizen of the State of Delaware and the State of Colorado for purposes of diversity jurisdiction.

6.      This Court has personal jurisdiction over RE/MAX because it transacts business within the state, has committed torts within the state, has committed torts outside the state that have caused injury within the state, has availed itself of the benefits of this jurisdiction, has entered into contracts with Quicken Loans performable in this state, and has committed other acts complained of herein within the Eastern District of Michigan (the "District").

7.      Venue is proper in this District under 28 U.S.C. §1391(b)(2) because a substantial part of the events and omissions giving rise to Quicken Loans' claims occurred within the Eastern District of Michigan.

### CONDITIONS PRECEDENT

8.      All conditions precedent have been performed or have occurred.

---

## FACTUAL BACKGROUND

9.      RE/MAX, on the one hand, is in the business of franchising real estate brokerage services by recruiting and retaining real estate agents through the sale of a RE/MAX franchise. As detailed below, RE/MAX then attempts to leverage its network of franchisees to secure marketing arrangements and fees for itself (the franchisor) without regard to the interests of its network of agents/franchisees.  RE/MAX fails to disclose when it is acting for just the corporate franchisor and when it purports to act for the 104,000 agents it claims within its network.  As such, this dispute involves only RE/MAX/Franchisor, and none of the thousands of real estate agents/franchisees that RE/MAX erroneously claimed to represent.

10.     Quicken Loans, on the other hand, is the second largest mortgage lender in the country, the largest online mortgage lender, is ranked No. 5 on FORTUNE magazine's annual "100 Best Companies to Work For" list in 2016, and has been named among the top-30 companies on the list for 13 consecutive years.  It has helped families weather one of the most tumultuous times for home ownership in U. S. history, and has done so with distinction, earning the highest possible rating from J.D. Power and Associates for Customer Satisfaction in Primary Mortgage Origination for six straight years (from 2010 to 2015) and for Mortgage Servicing Client Satisfaction for three straight years (from 2014 to 2016).

11.     Given Quicken Loans' stellar reputation and client-centered innovation, RE/MAX approached Quicken Loans in the summer of 2015 regarding a potential marketing alliance. During that discussion, RE/MAX claimed a competing originator had developed $10 billion of business as a direct result of its marketing partnership with RE/MAX.

12.     Because RE/MAX represented there was only a narrow two-week window to discuss a potential alliance, Quicken Loans and RE/MAX quickly explored the marketing opportunities that RE/MAX presented, and based on RE/MAX's representations, Quicken Loans was led to believe that there was sufficient value in RE/MAX's proposed/abstract marketing alliance to justify the proposed price.  So the dialogue continued.

13.     Eventually, Quicken Loans and RE/MAX entered into a Strategic Marketing Alliance Agreement on July 9, 2015, which would not be effective until roughly three months later on October 15, 2015 ("the Agreement," attached at **Exhibit A**).

14.     The Agreement required RE/MAX to provide specific deliverables to Quicken Loans, namely: (a) certain web-based advertising; (b) mortgage tools advertising; (c) intranet advertising; (d) affiliate training; (e) print advertising; (f) event participation; and (g) the promotion of Quicken Loans to RE/MAX franchisees and affiliates.

15.     During this same general time frame, certain regulatory changes occurred and related federal interpretations were issued, all of which impacted the legality and viability of the Agreement.  Given the dynamic legal landscape, Quicken Loans continued to analyze how to perform under the Agreement, if at all, while complying with all governing legal standards.

16.     To this end, Quicken Loans secured a valuation from an independent third party in early September 2015, which uncovered and exposed the material overvaluation of the Agreement and determined that it was worth merely half the value that RE/MAX had claimed.

17.     When Quicken Loans disclosed to RE/MAX that the contract was overvalued and therefore impermissible under governing Federal authority, RE/MAX responded by making various representations to Quicken Loans (including representations in the form of an Excel spreadsheet dated September 22, 2015, and which RE/MAX titled a "Draft Analysis of Services

Provided by RE/MAX, LLC to Quicken Loans" (the "Spreadsheet" attached at **Exhibit B**)) relating to the value, activity levels, and scope of the marketing services to be provided by RE/MAX.  On information and belief, RE/MAX knew that the values, activity levels and scope of the marketing services as represented to Derek Latka (Vice President of Business Development at Quicken Loans) and as set forth in the Spreadsheet were false (and RE/MAX knew it had no ability to provide its marketing services at these levels) but made the representations to justify its fee and induce Quicken Loans to continue with the marketing alliance.

18.     By way of example, RE/MAX's misrepresentations to Quicken Loans included: (1) misrepresenting to Mr. Latka, on September 22, 2015, that there would be 4.25 million unique visitors per month to the remax.com homepage, which would display Quicken Loans' logo; (2) Mike Ryan (Executive Vice President of RE/MAX) intentionally concealing RE/MAX's inability to provide its marketing services in certain independently-owned and operated regions when negotiating and describing web presence and internet traffic with Mr. Latka, on September 22, 2015 and again during early October 2015, making those representations regarding value, activity levels, and scope of its services false; (3) Mr. Ryan falsely representing to Mr. Latka, several times, including on September 22, 2015, that Quicken Loans's links or logos would be embedded on each property listing webpage (both desktop and mobile-accessed websites) while concealing the fact that RE/MAX did not have the authority or access to provide such marketing services; and (4) Mr. Ryan misrepresenting to Mr. Latka on or about September 22, 2015 that the remax.com site generated over one million direct customer leads to RE/MAX agents (which would include a check-box for more information regarding a loan with Quicken Loans); yet Mr. Ryan knew, when making these false representations, that the

sites generated only a fraction of that number of leads (no more than 360,000 leads), and that many of those dramatically reduced leads are actually bogus, automated inquiries (collectively, the "Representations").

19.     These disingenuous attempts by RE/MAX to justify its fee under the Agreement were the first clear signs that the two parties presented wholly contrasting corporate cultures: RE/MAX wanted to prove it was right; Quicken Loans sought to do what was right.

20.     Before the parties ever performed under the terms of the Agreement, Quicken Loans sought an amendment in reliance on RE/MAX's Representations and in an effort to cure aspects of the Agreement that appeared to conflict with the additional regulatory interpretations that certain federal agencies provided after the parties signed the Agreement.  Accordingly, the parties entered into the First Amendment to Strategic Marketing Alliance Agreement dated November 10, 2015 (the "Amendment" attached at **Exhibit C**).

21.     Thereafter, Quicken Loans, in reliance on RE/MAX's assurance of performance consistent with the specifications detailed in (a) the Representations, (b) the modified terms of the Amendment, (c) the Agreement and (d) a valuation that reflected goods and services consistent with the fees incurred, attempted to proceed with the implementation of the Agreement, Amendment, and the Representations, including providing payment to RE/MAX of over $2.3 million dollars.

22.     Shortly after attempting to implement the terms of the Agreement, and despite Quicken Loans' efforts to address RE/MAX's questionable marketing scheme, RE/MAX failed to perform in a manner consistent with the Agreement, the Amendment, the Representations or the parties' intent.  By way of example, RE/MAX did not perform its obligations pursuant to Section 6 and Exhibit E of the Agreement, as amended, by refusing to fulfill its obligations set

---

forth in Exhibit E with respect to RE/MAX franchisees/agents; failing to implement on remax.com the ability for consumers to request information on pre-approval from Quicken Loans by the required deadline; failing to implement digital Quicken Loans ad placements on the RE/MAX mobile app by the required deadline; and failing to implement Quicken Loans sponsored listing videos to remax.com. Given these failures, the Amendment failed to cure the central offending aspect of RE/MAX's marketing scheme: an overvalued price leading to RE/MAX securing marketing fees that are not reasonably related to the value of the goods or services received in return – a violation of RESPA.

23.     As soon as Quicken Loans learned that RE/MAX's Representations regarding its ability to perform were false, it sought to further revise the marketing agreement to ensure compliance with all legal standards. Simply put, Quicken Loans has sought to do the right thing. RE/MAX, instead, has rejected any modification to the parties' marketing alliance – and has refused or neglected its obligations to cure the Agreement's shortcomings, all of which impact the legality of the Agreement and Amendment.

## CAUSES OF ACTION

### COUNT 1 - DECLARATORY JUDGMENT

24.     Quicken Loans incorporates herein by reference paragraphs 1 through 23.

25.     The parties entered into the Agreement and the Amendment.

26.     There has been a change in interpretation of law, rule or regulation that impacts the legality of the terms of the Agreement and Amendment.

27.     The change in interpretation of law, rule or regulation renders the Agreement and Amendment a contract violative of the Real Estate Settlement Practices Act.

---

28.     Quicken Loans seeks a declaration that, as a matter of law, the Agreement and Amendment are forbidden under prevailing, binding legal authority, and, as such, are void *ab initio*.

29.     Accordingly, Quicken Loans seeks, pursuant to Rule 57 of the Federal Rules of Civil Procedure, a declaration that it is not required to perform under an impermissible contract or provide any compensation that violates any aspect of Federal or State law.

30.     Moreover, any and all compensation that was provided is to be disgorged and returned to Quicken Loans. Quicken Loans has also been required to retain the services of Morganroth & Morganroth, PLLC and Greenberg Traurig, LLP and has agreed to pay both firms a reasonable fee.  Because this is a suit for declaratory relief, Quicken Loans is entitled to recover reasonable and necessary attorneys' fees that are equitable and just.

## COUNT 2 - FRAUDULENT INDUCEMENT

31.     Quicken Loans incorporates herein by reference paragraphs 1 through 30.

32.     RE/MAX represented that it would provide certain marketing services and deliverables to Quicken Loans as set forth in the Representations.

33.     RE/MAX's Representations were false.

34.     At the time RE/MAX provided the assurances of performance (as detailed in the Representations), RE/MAX knew those representations were false or made them recklessly.

35.     RE/MAX made the Representations to Quicken Loans with the intention that Quicken Loans would act upon those representations and enter into the Amendment.

36.     Quicken Loans acted in reliance on the Representations and entered into the Amendment.

---

37.     Quicken Loans suffered damages as a result of RE/MAX's acts and omissions. Quicken Loan seeks disgorgement of any and all compensation that was provided to RE/MAX, including but not limited to the payment of $2.3 million dollars plus interest.

### COUNT 3 – UNJUST ENRICHMENT

38.     Quicken Loans incorporates herein by reference paragraphs 1 through 37.

39.     At Quicken Loans expense, RE/MAX received over $2.3 million dollars.

40.     RE/MAX received these amounts for marketing services and deliverables that it promised, but failed or refused to provide, making it unjust for RE/MAX to retain the payment or receive any further payment.

41.     Quicken Loans has been damaged as a result of RE/MAX's conduct. Accordingly, Quicken Loans seeks disgorgement of any and all compensation that was provided to RE/MAX, including but not limited to the payment of $2.3 million dollars plus interest.

### COUNT 4 - PROMISSORY ESTOPPEL

42.     Quicken Loans incorporates herein by reference paragraphs 1 through 41.

43.     RE/MAX promised to provide certain quantifiable marketing services and deliverables to Quicken Loans in its Representations.

44.     RE/MAX reasonably should have expected that its Representations would induce Quicken Loans to enter into the Amendment (or to forbear from terminating the Agreement), which in fact produced reliance or forbearance of that nature.

45.     For injustice to be avoided, RE/MAX's Representations must be enforced. Quicken Loans seeks disgorgement of any and all compensation that was provided to RE/MAX, including but not limited to the payment of $2.3 million dollars plus interest.

---

## COUNT 5 - BREACH OF CONTRACT (IN THE ALTERNATIVE)

46.     Quicken Loans incorporates herein by reference paragraphs 1 through 23.

47.     Quicken Loans and RE/MAX entered into the Agreement and the Amendment.

48.     RE/MAX failed to provide certain marketing services and deliverables as required under the Agreement and the Amendment.

49.     Quicken Loans performed its obligations under the Agreement and/or the Amendment (or was excused from doing so).

50.     RE/MAX's failure to provide certain marketing services resulted in damages to Quicken Loans.   In addition, Quicken Loans has been required to retain the services of Greenberg Traurig, LLP and has agreed to pay Greenberg Traurig, LLP a reasonable fee. Because this is a suit for breach of contract, Quicken Loans is entitled to recover reasonable and necessary attorneys' fees that are equitable and just.

## PRAYER FOR RELIEF

WHEREFORE, Quicken Loans respectfully requests the following relief:

A.     That the Court award Plaintiff appropriate relief, to include actual and statutory damages, disgorgement, and restitution;

B.     That the Court award Plaintiff preliminary or other equitable or declaratory relief as may be appropriate by way of applicable state or federal law;

C.     That the Court impose exemplary and/or punitive damages under any provision of law under which exemplary and/or punitive damages may be imposed;

D.     That the Court award Plaintiff such other, favorable relief as may be available and appropriate under law or at equity;

E.     That the Court award costs and reasonable attorneys' fees; and

F.      That the Court enter such other and further relief as the Court may deem just and proper.

**J**URY **T**RIAL **D**EMANDED

Pursuant to Federal Rule 38(b), Quicken Loans hereby demands a trial by jury on all issues so triable that are raised by this Complaint.

Respectfully submitted,

*/s/ Jeffrey B. Morganroth*
Jeffrey B. Morganroth
**M**ORGANROTH **& M**ORGANROTH**, PLLC**
344 North Old Woodward Avenue, Suite 200
Birmingham, Michigan 48009
248.864.4000 – telephone
248.864.4001 – facsimile
jmorganroth@morganrothlaw.com
P41670

*/s/ Membership Application To Be Submitted*
Peter S. Wahby
**G**REENBERG **T**RAURIG **LLP**
2200 Ross Avenue, Suite 5200
Dallas, Texas 75201
214.665.3600 – telephone
214.665.3601 – facsimile
wahbyp@gtlaw.com
Texas Bar No. 24011171

**ATTORNEYS FOR PLAINTIFF
QUICKEN LOANS INC.**

Case 1:16-cv-02696-RM-NYW   Document 3   Filed 11/01/16   USDC Colorado   Page 12 of 58
Case 2:17-mc-50617-DML-RSW   ECF No. 1-3 PageID.55 Filed 05/01/17   Page 13 of 59
2:16-cv-13233-DML-RSW   Doc No. 1-3   Filed 09/05/16   Pg 13 of 1   Pg ID 22

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN


QUICKEN LOANS INC.,

        Plaintiff,

v.                                        Civil Action No. 2:16-cv-13233

RE/MAX, LLC,

        Defendant.


**INDEX OF EXHIBITS**

| **Exhibit** | **Description** |
| --- | --- |
| A | Strategic Marketing Alliance Agreement |
| B | Excel spreadsheet dated September 22, 2015 |
| C | First Amendment to Strategic Marketing Alliance Agreement dated November 10, 2015 |

# EXHIBIT A

## STRATEGIC MARKETING ALLIANCE AGREEMENT

This Strategic Marketing Alliance Agreement is entered into this 9th day of July 2015 but shall not become effective until the 15th day of October 2015 (the "Effective Date") by and between RE/MAX, LLC, a Delaware limited liability company, whose address is 5075 South Syracuse Street, Denver, CO 80237 ("RE/MAX") and Quicken Loans Inc. a Michigan corporation, whose address is 1050 Woodward Avenue, Detroit, MI 48226 ("Quicken Loans"). RE/MAX and Quicken Loans are sometimes referred to individually as a "Party" and collectively as "Parties".

Whereas, RE/MAX is engaged in franchising real estate brokerage offices both domestically and internationally and provides support and services to RE/MAX franchisees and sales associates affiliated with such RE/MAX franchisees ("RE/MAX Affiliates"), and all other persons that are part of the RE/MAX Network; and

Whereas, Quicken Loans is a national lender that offers consumers residential mortgage loan products, along with other goods and services and desires to enter into this Agreement and become a RE/MAX Approved Supplier in order to market and promote its Goods and Services (as defined below) through the Approved Supplier Program.

Now, therefore, in consideration of the mutual promises and covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## SECTION 1. DEFINITIONS

When used in this Agreement, the following initially capitalized words and phrases will have the meanings ascribed to them as set forth below:

**"Agreement"** means this Strategic Marketing Alliance Agreement, together with all exhibits and schedules thereto.

**"Confidential Information"** has the meaning set forth in Section 11.

**"Designated Representative"** has the meaning set forth in Section 5(g) and Section 6(f).

**"Effective Date"** has the meaning set forth in the Preamble.

**"Event of Default"** has the meaning set forth in Section 10.2.

**"Goods and Services"** means the products and services set forth on Exhibit A.

**"Leads"** means the number of potential borrowers who contact Quicken Loans as a result of or in response to any of the marketing activities conducted under this Agreement.

**"Losses"** means any and all reasonable and customary losses, damages, deficiencies, claims, liabilities, taxes, interest, fines, penalties, suits, actions, proceedings, demands, costs or expenses, including, without limitation, court costs or arbitration costs and reasonable attorneys' fees.

**"Marketing Fee"** has the meaning set forth in Section 4.1.

**"Program"** means the promotion of the Goods and Services Quicken Loans agrees to offer pursuant to this Agreement.

**"Quicken Loans Marks"** means the Quicken Loans name, trademarks, service marks, logos, slogans, trade dress and other proprietary descriptions, whether registered or unregistered as set forth in Exhibit D-2.

**"Quicken Loans Web Site"** has the meaning set forth in Section 5(e).

**"RE/MAX Affiliated Company"** means any entity controlling, controlled by or under common control with RE/MAX.

**"RE/MAX Affiliate"** means a RE/MAX Franchisee or a RE/MAX sales associate affiliated with a RE/MAX Franchisee.

**"RE/MAX Approved Supplier"** means a supplier who has entered into a valid Approved Supplier Agreement with RE/MAX to participate in the RE/MAX Approved Supplier Program.

**"RE/MAX Approved Supplier Program"** means the Program designed for third party vendors that provides access to the RE/MAX Network for the purpose of marketing and selling its Goods and Services to RE/MAX Affiliates, includes a license to use and display the RE/MAX Marks in marketing materials promoting its Goods and Services, and provides other benefits designed to assist the vendor in the marketing and selling of its Goods and Services through the marketing programs as substantially set forth in Exhibit E.

**"RE/MAX Franchisee"** means any individual or legal entity that has entered into a franchise agreement with RE/MAX.

**"RE/MAX Mainstreet"** means an extra-net website accessible only by RE/MAX Affiliates and RE/MAX Approved Suppliers and which includes a "shop" section that contains links to RE/MAX Approved Suppliers' websites.

**"RE/MAX MarketPlace"** means a dedicated area at the annual RE/MAX Convention and the annual RE/MAX Broker Owner Conference where RE/MAX Approved Suppliers market and promote Goods and Services.

"**RE/MAX Marks**" means the RE/MAX name, trademarks, service marks, logos, slogans, trade dress and other proprietary descriptions, whether registered or unregistered as set forth in Exhibit D-1 and the RE/MAX Approved Supplier Logo as set forth on Exhibit B.

"**RE/MAX Network**" means all RE/MAX Affiliates.

"**RE/MAX Web Roster**" means an online database of RE/MAX Affiliates containing their names, postal addresses, telephone numbers, and email addresses.

"**Renewal Term**" has the meaning set forth in Section 10.1(b).

"**Residential Mortgages**" has the meaning set forth in 2.2.

"**Term**" has the meaning set forth in Section 10.1(a).

## SECTION 2.  RE/MAX APPROVED SUPPLIER – TRADEMARK LICENSE

**2.1**  **RE/MAX Approved Supplier**.  RE/MAX hereby designates Quicken Loans as a RE/MAX Approved Supplier and authorizes Quicken Loans to market, promote and sell its Goods and Services through the RE/MAX Approved Supplier Program.

**2.2**  **Preferred Mortgage Provider**.  RE/MAX hereby designates Quicken Loans as its preferred residential mortgage provider. RE/MAX agrees that, during the Term of this Agreement, RE/MAX shall not designate any other party as a preferred mortgage provider with respect to residential mortgages for owner occupied homes ("Residential Mortgages"). RE/MAX may, however, designate other parties as preferred providers or enter into similar marketing arrangements with other providers of mortgages for properties other than single family, owner-occupied homes as well as providers of products and services that may be related to or ancillary to mortgages.

**2.3**  **RE/MAX Approved Supplier Logo**.  Quicken Loans agrees to use and display the RE/MAX Approved Supplier logo, in the exact style and format, and proportionately no less than one inch in height from the top of the balloon to the bottom of the disclaimer, as depicted on Exhibit B in connection with all advertising and promotion of its Goods and Services to RE/MAX Affiliates and only for the limited purpose of identifying itself as a RE/MAX Approved Supplier.  RE/MAX shall provide Quicken Loans with a copy of the most current version of the RE/MAX Approved Supplier logo whenever it is modified or changed.  Quicken Loans agrees that the RE/MAX Approved Supplier logo will always be used or displayed in such a manner as to ensure that RE/MAX Affiliates and the public understand that, except for its designation as a RE/MAX Approved Supplier, Quicken Loans is not in any way related to, sponsored by, or affiliated with RE/MAX.

3

     **2.4**    **URL Address.**  Upon the prior written consent of RE/MAX, Quicken Loans may include the service mark "REMAX", but no other RE/MAX Marks, as part of the post-domain path of the Quicken Loans Internet URL address (e.g., www.quickenloans.com/remax).

     **2.5**    **Trademark Licenses.**

     (a)    During the Term of this Agreement and subject to the terms provided herein, RE/MAX grants to Quicken Loans a non-exclusive, non-transferable, non-assignable, royalty free, revocable, with no right to sublicense, limited license, to use and display the RE/MAX Marks, solely on marketing materials for its Goods and Services approved in advance by RE/MAX, and solely in connection with marketing and promotion under this Agreement. In no event shall such license be construed to permit or authorize Quicken Loans or any persons or entities that (a) control Quicken Loans (b) are controlled by Quicken Loans or (c) are under common control with Quicken Loans to use the RE/MAX Marks in conjunction with the offering of real estate brokerage services by such person or entity.

     (b)    Quicken Loans expressly acknowledges that RE/MAX is the owner of all right, title and interest in and to the RE/MAX Marks and agrees that it shall not at any time have or acquire any interest in the RE/MAX Marks and further agrees that all such use or display of the RE/MAX Marks inures to the exclusive benefit of RE/MAX. Quicken Loans agrees to abide by all standards and guidelines of RE/MAX with respect to the proper use and display of the RE/MAX Marks as set forth in the RE/MAX Brand Identity Trademark and Graphic Standards manual ("Trademark Manual"), as from time to time amended. The current version of the Trademark Manual has been provided to Quicken Loans, and updated versions of the Trademark Manual will be provided as they become available. RE/MAX reserves the right to control the quality of the limited use by Quicken Loans of the RE/MAX Marks in its sole and absolute discretion. Except as authorized pursuant to this agreement, Quicken Loans agrees not to use the RE/MAX Marks for any purpose without the prior written consent of RE/MAX. Quicken Loans shall not adopt, use, register, or seek to register any trade name, trademark or service mark anywhere in the world that is identical to, or is confusingly similar to any RE/MAX Marks. Quicken Loans agrees that neither during the Term of this Agreement nor at any time after termination or expiration of this Agreement, shall Quicken Loans directly or indirectly, dispute or contest the validity or enforceability of any of the RE/MAX Marks, attempt any registration thereof, or attempt to dilute the value of the goodwill attached thereto. The Parties agree that Section 2.5(b) shall survive termination or expiration of this Agreement.

     (c)    During the Term of this Agreement and subject to the terms provided herein, Quicken Loans grants to RE/MAX a non-exclusive, non-transferable, non-assignable, royalty free, revocable, with no right to sublicense, limited license, to use and display the Quicken Loans Marks, solely on marketing materials approved in advance by Quicken Loans, and solely in connection with marketing and promotion of Quicken Loans pursuant to this Agreement.

(d)      RE/MAX expressly acknowledges that Quicken Loans is the owner or exclusive licensee of all right, title and interest in and to the Quicken Loans Marks and agrees that it shall not at any time have or acquire any interest in the Quicken Loans Marks and further agrees that all such use or display of the Quicken Loans Marks inures to the exclusive benefit of Quicken Loans. RE/MAX agrees to abide by all the Quicken Loans customary standards and guidelines Quicken Loans provides to RE/MAX with respect to the proper use and display of the Quicken Loans Marks. Quicken Loans reserves the right to control the quality of the limited use by RE/MAX of the Quicken Loans Marks in its sole and absolute discretion.  Except as authorized pursuant to this agreement, RE/MAX agrees not to use the Quicken Loans Marks for any purpose without the prior written consent of Quicken Loans. RE/MAX shall not adopt, use, register, or seek to register any trade name, trademark or service mark anywhere in the world that is identical to, or is confusingly similar to any Quicken Loans Marks.  RE/MAX agrees that neither during the Term of this Agreement nor at any time after termination or expiration of this Agreement, shall RE/MAX directly or indirectly, dispute or contest the validity or enforceability of any of the Quicken Loans Marks, attempt any registration thereof, or attempt to dilute the value of the goodwill attached thereto.  The Parties agree that Section 2.5(d) shall survive termination or expiration of this Agreement.

### 2.6      **Press Releases and Publicity**

Neither Party shall issue any press release or similar broadly-disseminated communication that uses the other Party's name, any of the other party's marks or any quotations of the other Party's officers or employees without the prior written consent of such Party regarding the content and timing of such release or communication. This Section 2.6 shall not restrict the ability of Quicken Loans to distribute marketing materials related to its Goods and Services to RE/MAX Affiliates in accordance with this Agreement.

### SECTION 3.  QUICKEN LOANS GOODS AND SERVICES

### 3.1      **Approval of Goods and Services.**  Quicken Loans agrees it will not market or sell any goods or services to RE/MAX Affiliates other than those set forth in Exhibit A without the prior written consent of RE/MAX.

### SECTION 4.  COMPENSATION

### 4.1      **RE/MAX Approved Supplier Access Fee**.

(a)      as consideration for the rights granted herein and the access afforded to Quicken Loans to market and promote the Goods and Services to RE/MAX Affiliates, Quicken Loans agrees to pay RE/MAX, attention of Manager, Approved Supplier Program, during the Term of this Agreement the following fees (collectively the "Marketing Fees"):

(i)       a monthly marketing fee of three hundred twenty-five thousand dollars ($325,000), which fee shall be due and paid within thirty (30) days of the end of each month;

(ii)       a yearly payment of two hundred fifty thousand dollars ($250,000) for participation as the exclusive Residential Mortgages sponsor in the annual RE/MAX Convention, which shall be paid within thirty (30) days of the end of the month in which the RE/MAX Convention takes place;

(iii)       a yearly payment of one hundred fifty thousand dollars ($150,000) for participation as the exclusive Residential Mortgages sponsor in the annual RE/MAX Broker Owner Conference, which shall be paid within 30 days of the end of the month in which the RE/MAX Broker Owner Conference takes place.

(b)       No part of any Marketing Fee payable by Quicken Loans to RE/MAX under this Agreement shall be paid by either Party to any RE/MAX Franchisee or RE/MAX Affiliate. The Marketing Fee is determined upon the Parties' expectation that the fees reflect the reasonable value of the goods, facilities and services provided under the Agreement.

(c)       RE/MAX may change the Marketing Fees for any Renewal Term provided that RE/MAX notifies Quicken Loans no later than 90 days before the expiration of each Term of this Agreement of the amount of the RE/MAX Approved Supplier Access Fee for the following Renewal Term. If RE/MAX does not notify Quicken Loans of a change to the Marketing Fee for a Renewal Term in accordance with the preceding sentence, the fee shall remain the same as for the previous Term.

**4.2**       **No Guarantee**.  Quicken Loans acknowledges and agrees that RE/MAX Franchises are independently owned and operated businesses and that sales associates affiliated with RE/MAX Franchises are independent contractors, and that RE/MAX cannot and does not guarantee any level of sales of Goods and Services through the Program. Quicken Loans further acknowledges that the customers of RE/MAX Affiliates are free to use any lender and that RE/MAX cannot require or guarantee use of Quicken Loans Goods by any customers of RE/MAX Affiliates.

## SECTION 5.  OBLIGATIONS OF SUPPLIER

Throughout the Term of this Agreement, Quicken Loans agrees to provide the necessary facilities and services to market and promote the Goods and Services to RE/MAX Affiliates.

Quicken Loans:

(a)       shall, at its expense, attend and exhibit its Goods and Services in the RE/MAX MarketPlace at the annual RE/MAX Convention.  Quicken Loans shall staff the exhibit space during all open tradeshow hours and adhere to all current tradeshow standards;

    (b)    shall at its expense, attend and exhibit its Goods and Services in the RE/MAX MarketPlace at the annual RE/MAX Broker Owner Conference.  Quicken Loans shall staff the exhibit space during all open tradeshow hours, and adhere to all current tradeshow standards;

    (c)    shall obtain the prior written consent of RE/MAX before distributing any marketing materials that contain RE/MAX Marks;

    (d)    shall comply with all provisions of the RE/MAX Approved Supplier Electronic Advertising Policy as set forth in Exhibit C, as from time to time amended;

    (e)    shall, at its expense,  create, host, and have operational within ninety (90) days of the Effective Date of this Agreement, a co-branded Quicken Loans Web Site; or a co-branded landing page that is linked to a generic Quicken Loans Web Site.  Quicken Loans Web Site must be capable of being accessed from the "Shop" section of RE/MAX Mainstreet located at www.remax.net by a hyperlink on RE/MAX Mainstreet to enable RE/MAX Affiliates view information about the Goods and Services and to contact Quicken Loans;

    (f)    shall, no later than ten (10) days after the end of each month, provide RE/MAX a report showing the number of Leads from such month, in a format acceptable to RE/MAX. Quicken Loans agrees to provide RE/MAX or its representatives supporting books and records, upon reasonable notice, to  further substantiate reporting previously provided for the purpose of verifying the number of Leads;

    (g)    shall assign competent personnel to act as a Designated Representative, who shall be available during normal business hours, to work closely and directly with the RE/MAX Designated Representative to manage the relationship between the Parties, to implement the goals and objectives of this Agreement and the RE/MAX Approved Supplier Program, ensure that maximum effort is given to marketing and promotional activities, and to address and respond to questions from RE/MAX Affiliates; and

    (h)    With respect to the RE/MAX MarketPlace, Quicken Loans shall maintain at all times during the Term of this Agreement, and for a period of not less than six (6) months after the termination or expiration of this Agreement, the following insurance and shall provide a certificate of insurance satisfactory to RE/MAX for the following:

    (i)    A comprehensive commercial general liability insurance policy ("Insurance Policy") that insures against products liability, liability for completed operations, contractual liability, liability for bodily injury, personal injury or death to persons and damage to property.  Such Insurance Policy shall also include advertising and communications liability that insures against libel, slander, defamation, infringement of copyright, infringement of title, slogans, trademarks, service marks, service names, piracy, plagiarism and invasion of privacy that arise out of or are the subject matter of this Agreement.   The limit of liability under the Insurance Policy shall not be less than $1,000,000 combined single limit per each

occurrence. The Insurance Policy shall include RE/MAX as an additional insured and shall contain a waiver by the insurance carrier of all subrogation rights against RE/MAX and other parties covered by the insurance. The Insurance Policy shall be primary and non-contributing with any insurance that may be carried by RE/MAX and shall be an "occurrence" policy rather than a "claims made" policy. The insurance coverage herein shall be issued by an insurance company with a current A.M. Best Insurance Guide rating of not less than A-, XIII.

(ii)     As may be required by law, a worker's compensation insurance policy and an employer's liability policy covering all employees of Quicken Loans. The employer's liability insurance limits shall not be less than $100,000 per occurrence for each accident for bodily injury by accident and not less than $100,000 per occurrence each employee for bodily injury by disease. The worker's compensation insurance and employer's liability insurance carried by Quicken Loans shall be "occurrence" policies rather than "claims made" policies.

(iii)    Evidence of the procurement of such insurance shall be provided to RE/MAX at RE/MAX, LLC, 5075 S. Syracuse Street, Denver, CO 80237 Attn: Manager, Approved Supplier Program. Should any of the policies required hereunder be canceled before the expiration date thereof, Quicken Loans shall ensure notice of such will be delivered to RE/MAX in accordance with policy provisions but in no event later than 10 days prior to such cancellation.

## SECTION 6.  OBLIGATIONS OF RE/MAX

Throughout the Term of this Agreement, RE/MAX agrees to use commercially reasonable efforts, in compliance with all applicable laws and regulations, to promote to RE/MAX Affiliates the benefit of entering into marketing arrangements with Quicken Loans, to promote Quicken Loans as the preferred Residential Mortgage provider to RE/MAX Affiliates, to provide the necessary facilities and services for Quicken Loans to market and promote the Goods and Services to RE/MAX Affiliates and to perform the activities set forth in Section 6 of this Agreement and Exhibit E, as such may be amended from time to time by mutual consent of the Parties.

RE/MAX:

(a)     shall host the annual RE/MAX Convention and make exhibit spaces available to Quicken Loans;

(b)     shall host the annual RE/MAX Broker Owner Conference and make exhibit spaces available to Quicken Loans;

(c)     shall provide Quicken Loans read only access to RE/MAX Mainstreet;

8

(d)    shall provide Quicken Loans access to the RE/MAX Web Roster, an on-line data base of RE/MAX Affiliates, to enable Quicken Loans to directly market its Goods and Services to RE/MAX Affiliates;

(e)    shall provide Quicken Loans a hyperlink/s in the "Shop" section of RE/MAX Mainstreet that links to the Quicken Loans Web Site and enables RE/MAX Affiliates to access the Quicken Loans Web Site to purchase Goods and Services;

(f)    shall assign competent personnel to act as a Designated Representative, who shall be available during normal business hours, to work closely and directly with the Quicken Loans Designated Representative to manage the relationship between the Parties, to implement the goals and objectives of this Agreement and the RE/MAX Approved Supplier Program, ensure that maximum effort is given to marketing and promotional activities, and to address and respond to questions from RE/MAX Affiliates; and

(g)    shall, to the extent such data is available to RE/MAX, provide Quicken Loans a monthly report, in a format reasonable acceptable to Quicken Loans, of the previous month's listing volume and sales volume for each RE/MAX Affiliate in the Company's Owned Regions. RE/MAX shall provide the report to Quicken Loans within 30 days of the end of each month during the Term.

## SECTION 7.  REVIEW OF MARKETING; ADDITIONAL OPPORTUNITIES

(a)    The Parties agree that, no less than twice per year during the Term of this Agreement a marketing committee comprised of an equal number of representatives of each of RE/MAX and Quicken Loans shall meet to review the marketing arrangements hereunder and to determine whether any changes to the marketing plan set forth on Exhibit E should be made. Any changes to the marketing plan or to any other part of the Agreement shall require the written agreement of both Parties hereto.

(b)    The Parties agree to explore mutually beneficial opportunities in other areas, including settlement services, relocation services and international mortgage origination.

## SECTION 8.  REPRESENTATIONS AND WARRANTIES

(a)    Each Party hereby represents and warrants to the other Party that as of the Effective Date of this Agreement and throughout the Term of this Agreement:

(i)    It is a limited liability company or corporation duly organized, validly existing, and in good standing under the laws of the state of its formation and has the power and authority to carry on its business as and where it is now being conducted.

     (ii)    It has the full power and authority necessary to enter into, execute, and deliver this Agreement and to perform its obligations under this Agreement.

     (iii)    This Agreement constitutes a legal, valid, and binding obligation of each Party, enforceable in accordance with its respective terms against such Party, except as such enforceability may be limited by applicable bankruptcy, insolvency, receivership, reorganization or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity.

     (iv)    No consent, approval, or authorization from any other person or party is required in connection with the negotiation, execution; delivery and performance of this Agreement, except such as have been obtained and are in full force and effect.

     (v)    The execution, delivery and performance of this Agreement by such Party does not and will not constitute a violation, conflict with or result in a breach of any applicable law, rule, regulation, court order or ruling applicable to such Party.

     (vi)    It will perform all of its activities, obligations and responsibilities contemplated under this Agreement in compliance, in all material respects, with all applicable legal requirements, including, without limitation, all federal, state and local laws, rules and regulations, including the CAN-SPAM Act of 2003 and those laws pertaining to privacy.

(b)    RE/MAX hereby represents and warrants to Quicken Loans that as of the Effective Date of this Agreement and throughout the Term of this Agreement:

     (i)    RE/MAX is the owner of or has acquired the rights to use the RE/MAX Marks, and has the right to grant Quicken Loans the right to use and display such RE/MAX Marks in accordance with the terms and conditions of this Agreement. The use and display and reference to such RE/MAX Marks by Quicken Loans in accordance with the terms and conditions of this Agreement will not infringe upon the rights of any third party.

(c)    Quicken Loans hereby represents and warrants to RE/MAX that as of the Effective Date of this Agreement and throughout the Term of this Agreement:

     (i)    Quicken Loans will keep in force all governmental licenses and permits necessary to conduct the business contemplated by this Agreement.

     (ii)    Any information provided by a RE/MAX Affiliate who accesses the Quicken Loans Web Site from Mainstreet, or who directly accesses the Quicken Loans Web Site, will be maintained, accessed and transmitted in a secure environment and in compliance with applicable law.

(iii)     Quicken Loans and all persons or entities that (a) control Quicken Loans (b) are controlled by Quicken Loans or (c) are under common control with Quicken Loans do not own, and will not during the term of this Agreement, own any interest (other than ownership of less than one percent (1%) of the outstanding stock of any publicly traded company) in a franchisor of real estate brokerages.

(iv)     Quicken Loans is the owner of or has acquired the rights to use the Quicken Loans Marks, and has the right to grant RE/MAX the right to use and display such Quicken Loans Marks in accordance with the terms and conditions of this Agreement.  The use and display and reference to such Quicken Loans Marks by RE/MAX in accordance with the terms and conditions of this Agreement will not infringe upon the rights of any third party.

(v)     The Marketing Fees are reasonably related to the fair market value of the goods and services to be provided by RE/MAX under this Agreement, that payment of the Marketing Fees under this Agreement does not represent payment of a fee, kickback or other thing of value for mere referral of settlement services, that the payment of the Marketing Fees will not result in higher rates, points, or closing costs for customers of Quicken Loans, and that the payment of the Marketing Fees complies with all applicable law.

## SECTION 9.  INDEMNIFICATION

### 9.1     <u>Quicken Loans Indemnification</u>.

(a)     Quicken Loans shall indemnify, save, defend and hold RE/MAX and its officers, directors, employees, agents, and their respective successors and assigns harmless from and against any and all Losses which RE/MAX may incur or which may be claimed against RE/MAX as a result of:

(i)     any false, inaccurate, untrue or incomplete representation or warranty made by Quicken Loans in this Agreement or material breach of any representation or warranty made by Quicken Loans in this Agreement;

(ii)     any non-compliance of Quicken Loans Goods and Services with any applicable federal, state or local laws or regulations;

(iii)     any claim that Goods and Services offered by Quicken Loans or any part thereof infringe upon any patent, trademark, copyright or other intellectual property right of any third party;

(iv)     the material breach by Quicken Loans of any applicable covenant, consideration or obligation of this Agreement;

(v)     any negligence or other tortious act or omission by Quicken Loans in connection with its attendance at the RE/MAX Convention or RE/MAX Broker Owner conference or any other event hosted by RE/MAX; and

(vi)    gross negligence or willful misconduct on the part of Quicken Loans under this Agreement.

## 9.2    **RE/MAX Indemnification**.

(a)     RE/MAX shall indemnify, save, defend and hold Quicken Loans and its officers, directors, employees, agents, and their respective successors and assigns, harmless from and against any and all Losses which Quicken Loans may incur or which may be claimed against Quicken Loans as a result of:

(i)     any false, inaccurate, untrue or incomplete representation or warranty made by RE/MAX in this Agreement or material breach of any representation or warranty made by RE/MAX in this Agreement;

(ii)    the material breach by RE/MAX of any applicable covenant, condition or obligation in this Agreement; and

(iii)   gross negligence or willful misconduct on the part of RE/MAX under this Agreement.

9.3    **Notice and Defense**. If any claim for indemnification arises under Section 9, the Indemnified Party shall notify the Indemnifying Party (the "Indemnity Notification"); provided that the failure to so notify the Indemnifying Party will not release the Indemnifying Party from its obligation to indemnify the Indemnified Party unless and to the extent that the Indemnifying Party is materially prejudiced by the failure to receive such notice.  The Indemnifying Party shall assume the defense of any such claim, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of all fees and expenses of such counsel, and shall consult with and keep the Indemnified Party reasonably informed with respect to the defense, compromise, settlement, resolution or other disposition of any such claim.    The Indemnified Party shall have the right to employ separate counsel in the defense of any such claim and participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of the Indemnified Party unless (i) the employment of such counsel shall have been specifically authorized in writing by the Indemnifying Party, (ii) the Indemnifying Party shall have failed to assume the defense of such action or employ counsel reasonably satisfactory to the Indemnified Party or (iii) representation of the Indemnified Party by the counsel retained by the Indemnifying Party would be inappropriate due to actual or potential differing interests between such Indemnified Party and any other Party represented by such counsel to such proceeding (in which case the Indemnifying Party shall not have the right to assume the defense of such action on behalf of the Indemnified Party). The Indemnifying Party shall promptly inform the Indemnified Party of all material aspects of such defense, compromise, any proposed

settlement, resolution or other disposition of any such claim. Neither Party shall admit any liability with respect to, or settle, compromise, resolve or discharge any such claim without the other Party's prior written consent, which consent shall not be unreasonably withheld in the case of any settlement, resolution, compromise or discharge involving only the payment of money.

The Parties agree that this Section 9 shall survive termination or expiration of this Agreement.

## SECTION 10. TERM AND TERMINATION

    **10.1**   **Term**.

    (a)   The initial Term of this Agreement shall commence on the Effective Date and four years after the Effective Date, unless sooner terminated in accordance with Section 10 of this Agreement.

    (b)   This Agreement will automatically extend at the end of the initial Term or any renewal Term for successive one (1) year periods (each, a "Renewal Term"), unless either Party gives written notice of its intention to not renew the Agreement at least sixty (60) days prior to the end of the then initial Term or the Renewal Term, unless sooner terminated in accordance with Section 10 of this Agreement.

    **10.2**   **Termination with Cause**. Each of the following acts or occurrences shall constitute an "Event of Default" giving rise to a right of termination by either Party under this Agreement:

    (a)   a Party shall file for bankruptcy, receivership, insolvency, reorganization, dissolution, or liquidation; or

    (b)   a Party shall have bankruptcy, receivership, insolvency, reorganization, dissolution, liquidation or similar proceedings instituted against it and such proceeding shall not be dismissed within sixty (60) days;

    (d)   a Party shall breach, in any material respect, any representation or warranty set forth herein, or any covenant, condition, requirement, agreement or obligation specified herein and, unless a shorter period of time is specified elsewhere in this Agreement, such breach shall continue for a period of ten (10) days after the non-breaching party notifies the other of its breach.

    **10.3**   **Termination for Event of Default**. Upon the occurrence of an Event of Default and at any time thereafter so long as the same shall be continuing, each Party shall have, in addition to the remedies provided elsewhere in this Agreement, the following remedies:

(a) The right immediately to terminate this Agreement, upon written notice to the other Party; and

(b) All other remedies otherwise available at law or in equity which each Party may, in its sole and absolute discretion, elect to pursue, either successively or concurrently.

### 10.4    Termination Without Default

(a) Quicken Loans may terminate this agreement immediately upon notice to RE/MAX in the event that Quicken Loans receives a cease and desist order from its regulator requiring it to terminate the Agreement.

(b) If Quicken Loans demonstrates that, as of December 31, 2017, it has not received the anticipated results of at least fifty thousand (50,000) Leads based upon the good faith efforts of the Parties, Quicken Loans may terminate this Agreement by delivering notice to RE/MAX no later than January 31, 2018 and, if such notice is given, termination shall be effective April 30, 2018.

### 10.5    Change in Law

In the event that, as a result of a change in law, rule or regulation or interpretation thereof by a regulatory authority or court of competent jurisdiction, either Party, acting in good faith and based upon the written opinion of nationally recognized counsel to such Party concludes that the terms and provisions of this Agreement do not comply in any material respect with any applicable law or regulation, then such Party shall have the right, by providing written notice to the other Party, to cause the Parties to enter into good faith discussions to restructure, renegotiate or otherwise amend the terms provided for in this Agreement as appropriate to cure such non-compliance with applicable law.

### 10.6    Effect of Termination.

(a) Termination of this Agreement in accordance with the terms and conditions hereof shall not release a party from liability for any Event of Default by such Party prior to such termination.

(b) Upon any termination or expiration of this Agreement, Quicken Loans shall immediately cease use of the RE/MAX Marks, use of the RE/MAX Approved Supplier logo, use of the service mark "REMAX" in the post-domain path of Quicken Loans Internet URL address and otherwise refrain from holding itself out as a current or former RE/MAX Approved Supplier, shall return to RE/MAX or destroy all lists, rosters, data bases containing the names of RE/MAX Affiliates or other membership lists or information or materials that may have been furnished to Quicken Loans in connection with this Agreement upon written request by RE/MAX, and shall thereafter refrain from the use of any such information in the solicitation of business. Quicken Loans shall

further cease use of any RE/MAX branded web site or landing page as contemplated by this Agreement.

(c)     Upon any termination or expiration of this Agreement, RE/MAX shall immediately cease use of the Quicken Loans Marks and shall return to Quicken Loans or destroy all lists, rosters, data bases containing Quicken Loans information or materials that may have been furnished to RE/MAX in connection with this Agreement, and shall thereafter refrain from the use of any such information in the solicitation of business. RE/MAX shall further cease use of any Quicken Loans branded web site or landing page as contemplated by this Agreement.

(d)     The provisions of this Section 10 shall survive termination or expiration of this Agreement.

## SECTION 11.  CONFIDENTIALITY

**11.1**

(a)     The Non-Disclosure Agreement entered into between the parties effective as of February 13, 2014 and attached hereto as Exhibit F is hereby incorporated by reference and shall govern this Section.  The term of that Non-Disclosure Agreement is hereby extended to match the term of this Agreement, as necessary.

## SECTION 12.  MISCELLANEOUS

**12.1**     **Assignment**.  This Agreement is not assignable by either Party without the prior written consent of the other Party.  Notwithstanding the foregoing, such consent shall not be unreasonably withheld.

**12.2**     **Limitation of Liability**.  IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY INDIRECT, SPECIAL, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES, WHETHER BASED ON BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, AND WHETHER OR NOT THAT PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGE.

**12.4**     **Notices**.  Any notices required or permitted to be given to either Party under this Agreement shall be deemed to have been properly delivered at the time delivered by hand, one business day after transmission by facsimile with written confirmation, one business day after being placed in the hands of a commercial courier service for overnight delivery and confirmed delivery and receipt of the same, or three business days after placement in the United States mail by registered or certified mail, return-receipt requested, postage prepaid and addressed to the Party to be notified at the

address set forth below (as used herein the term "business day" shall mean any day of the week, other than Saturday, Sunday or a legal holiday or a day or portion thereof on which national banks are required or authorized by law to be closed):

To RE/MAX:      RE/MAX, LLC
5075 South Syracuse Street
Denver, CO 80237
Attn: Mike Ryan
Telephone: 303.796.3697
Email: mryan@remax.com

Copy to:

Legal Department
RE/MAX, LLC
5075 South Syracuse Street
Denver, CO 80237
Telephone: 303.770.5531
Email: legal@remax.net

To Quicken Loans:  Quicken Loans Inc.
Address 1050 Woodward Avenue
City, State, ZIP Detroit, MI 48226
Attn: Legal Team
Telephone: (313) 373-4554
Email: GaryWeingarden@quickenloans.com

**12.5**   **No Implied Waiver**.  No delay or omission by a Party hereto to exercise any right, power or remedy occurring upon any noncompliance or default by a Party with respect to any of the terms of this Agreement shall impair any such right, power or remedy or be construed to be a waiver thereof.  A waiver by either Party hereto of any of the covenants, conditions or agreements to be performed by the other Party shall not be construed to be a waiver of any succeeding breach thereof or of any covenant, condition or agreement herein contained. No waiver of a breach on one occasion shall be deemed a waiver on another occasion.

**12.6**   **Relationship of Parties**.  Nothing in this Agreement shall be deemed to constitute a partnership, joint venture, employment or agency relationship between or among the Parties.  The relationship between the Parties is an independent contractor relationship.

**12.7**   **Entire Agreement**.  This Agreement, including any Exhibits and Attachments, contains the entire agreement of the Parties and supersedes all prior and contemporaneous understandings, agreements, warranties and representations of any kind, oral or written, relating to the subject matter of this Agreement.  This Agreement may be changed or altered only by written instrument specifically stating that it modifies

this Agreement and signed by the Party against whom enforcement of any waiver, change, modification, extension or discharge is sought.

      **12.8**    **Counterparts; Electronic Signatures**.  This Agreement may be executed in any number of counterparts and by electronic signatures, each of which shall be an original, but all of which together shall constitute one instrument.

      **12.9**    **Headings**.  The headings contained in this Agreement are for convenience only and shall not affect construction of any provision of this Agreement.

      **12.10** **Governing Law and Jurisdiction**.  This Agreement, and the rights and obligations of the Parties hereunder, shall be governed by and constructed in accordance with the laws of the State of Colorado, without regard to its conflicts of law principles. In the event of any dispute arising out of this Agreement, the matter shall be brought in a court of competent jurisdiction in the State of Colorado.  All parties hereby submit to the personal jurisdiction of such courts and waive any argument or contention that such courts constitute an inconvenient forum.

      **12.11** **Severability**.  If any provision hereof is invalid or unenforceable by a court of competent jurisdiction, such ineffectiveness or unenforceability of such provision shall be inapplicable and deemed omitted, but the remaining provisions of the Agreement shall remain in effect in accordance with their terms.

      **12.12** **Successors and Assigns**.  This Agreement shall be binding upon, and inure to the benefit of RE/MAX and Quicken Loans and their respective successors and permitted assigns.

      **12.13** **Force Majeure**.  In the event either Party is unable to timely perform services hereunder due to causes that are beyond its control, including, without limitation, unauthorized strikes, riots, terrorism, earthquakes, epidemics, war, fire, or any other catastrophe rendering it wholly or partially inoperable, such Party shall be excused from the performance of such services and shall not be liable for any loss or damage which results to the other Party.

      **12.14** **No Third Party Rights**.  Nothing herein contained, whether express or implied, is intended to confer any right or remedy under or by reason of this Agreement on any person or entity other than the Parties hereto and their respective successors and permitted assigns, and no action may be brought against any Party hereto by any third party claiming as a third party beneficiary to this Agreement or the transactions contemplated herein.

      **12.15** **Definitions.**  Words and terms defined in the singular may be referred to in the plural, and words and terms defined in the plural may be referred to in the singular.

IN WITNESS WHEREOF, this Agreement has been executed as of the day and year first written above.

QUICKEN LOANS, INC.                          RE/MAX, LLC

By: _____                  By: _____

Print Name: Jay Farner                       David L. Liniger

Title: President and CMO                      Chairman and CEO

Date: 7. 9. 15                               Date: _____

18

IN WITNESS WHEREOF, this Agreement has been executed as of the day and year first written above.

QUICKEN LOANS INC.

By: _____

Print Name: _____

Title: _____

Date: _____

RE/MAX, LLC

By: _____

David L. Liniger

Chairman and CEO

Date: July 10, 2015

18

EXHIBIT A

Effective October 15, 2015

- Origination of Residential Mortgages

## EXHIBIT B

RE/MAX APPROVED SUPPLIER LOGO



EXHIBIT C

RE/MAX APPROVED SUPPLIER PROGRAM
ELECTRONIC ADVERTISING POLICY

This Electronic Advertising Policy for Approved Suppliers of RE/MAX, LLC
("RE/MAX") shall be followed in all forms of electronic advertisements or other
commercial e-mail sent to RE/MAX Broker/Owners and Sales Associates ("RE/MAX
Affiliates") or RE/MAX employees:

1.   The Approved Supplier logo must be displayed in the e-mail. The minimum
     height for digital applications is 72 pixels.

2.   In the subject line of commercial electronic mail message, include the words
     "RE/MAX Approved Supplier" and accurately alert the recipient as to the e-
     mail's content.

3.   All e-mail sent to RE/MAX Affiliates or employees must contain an option for
     the recipient to decline further e-mail messages.  This must be done in a clear and
     conspicuous position and in a font size equal to that in the message.  The opt-out
     feature must enable a recipient to click on a link that automatically removes the e-
     mail address from your mailing list. It is also allowable for recipients to enter
     their e-mail address in a Web page submission field.

     Recipient's e-mail address must be included in the opt-out instructions. This is
     helpful in cases where the opt-out requires the recipient to enter his or her e-mail
     address in verification of mailbox ownership.

     Examples:   You are subscribed to this list because you previously agreed to
     receive commercial electronic mail messages from RE/MAX Approved Suppliers.
     You may click to unsubscribe youraddress@remax.net from receiving messages
     from Quicken Loans.

     Or:  You may click to unsubscribe youraddress@remax.net from receiving
     messages from Quicken Loans.

     Unsubscribe links in the form of an e-mail reply are not acceptable.

     Approved Suppliers must honor any unsubscribe requests, especially before
     sending another electronic mail advertising campaign.  In addition, this includes
     the removal of any electronic mail address which generates a permanent failure,
     or "bounce" message.

4.   Commercial electronic mail messages can be sent no more than one time per 30-
     day interval.

5.      Mailing lists must be updated for each new mailing. Mailings containing too many invalid remax.net addresses may trigger spam filters.

6.      Commercial electronic mail messages should be throttled (sent gradually) over a 12- to 24-hour period to minimize impact on the remax.net servers and sender reputation. Discuss with the Approved Supplier department if times shorter than 12 hours are required.

7.      If throttling is not possible, then commercial electronic mail messages may be sent in batches of 5,000 or less with a five minute delay in between the batches. Inform the Approved Supplier Department if this is the option to be used.

8.      Send mass mailings to recipients in a 1:1 ratio. That is, one letter to one recipient. Do not send mass mailings with multiple CCs or BCCs.

9.      Commercial electronic mail messages may not include file attachments.

10.     Commercial electronic mail messages may be sent ONLY to countries in your company's service areas.

11.     Commercial electronic mail messages must be sent from a valid e-mail address and domain associated with the Approved Supplier's company.

12.     In the text of each electronic mail, Approved Suppliers must include valid, non-electronic, contact information of the sending organization to include a physical mailing address and telephone number.

13.     Approved Supplier may not use the RE/MAX name or any abbreviations of the RE/MAX name in the "From" field on the e-mail address.  It should not appear that the e-mail is coming from RE/MAX.

14.     Approved Supplier must include the Approved Supplier Department from RE/MAX and the RE/MAX Mainstreet Administrative team on the recipient list. Use the following addresses: approvedsupplier@remax.net and abuse@remax.net

15.     Approved Supplier must comply with all applicable laws and regulations including federal, state and local laws, rules and regulations; in particular, Approved Supplier shall comply with all law governing the transmission of commercial e-mail, including but not limited to the CAN-SPAM Act of 2003.

16.     Except to comply with the CAN-SPAM Act of 2003 or another law, you may not transfer any e-mail address that you receive from RE/MAX to any third party until you have (a) obtained RE/MAX's affirmative consent and (b) obtained the addressee's affirmative consent to such transfer.

17.     Electronic advertisements may not contain content about competitors of RE/MAX or RE/MAX corporate affiliates.

18.   All commercial electronic mail messages must be forwarded to
      approvedsupplier@remax.net of the RE/MAX Approved Supplier Department for
      approval before being transmitted to RE/MAX Affiliates or RE/MAX employees.

**Please note:  RE/MAX, LLC and/or its e-mail-hosting provider reserve the right to
intercept and/or block e-mail to the RE/MAX organization that does not abide by
each of the electronic advertisement guidelines stated above.  In the event all
guidelines are not adhered to, electronic advertising privileges may be suspended or
revoked per the following:  1.) the first violation will result in a warning letter, 2.)
the second violation will result in electronic advertising privileges suspended for six
months, 3.) the third violation will result in electronic advertising privileges
suspended for six months and a $2,500 fine will be assessed, 4.) each violation
thereafter will result in electronic advertising privileges suspended for six months
and a $2,500 fine will be assessed.**

EXHIBIT D-1

RE/MAX MARKS





EXHIBIT D-2

QUICKEN LOANS MARKS

EXHIBIT E

*Custom Marketing Plan*

RE/MAX shall perform the marketing responsibilities listed below.

| | Electronic Marketing | Validation |
|---|---|---|
| 1. | **RE/MAX Home Webpage Advertising (remax.com)**<br><br>Continuously during the Term, RE/MAX will display Quicken Loans logos (banners or buttons) and a link to Quicken Loans Online Mortgage Center (OMC) on the RE/MAX main homepage (www.remax.com). | Each month, Quicken Loans will validate that Quicken Loans is advertised on the homepage by visiting www.remax.com. |
| 2. | **RE/MAX Mortgage Tools Advertising**<br><br>Continuously during the Term, RE/MAX will display Quicken Loans logos (banners or buttons) or link(s) to promote Quicken Loans as the provider of Mortgage Tools or the mortgage calculator featured in the Mortgage Tools section. | Each month, Quicken Loans will validate that Quicken Loans is advertised on the Mortgage Tools pages at [URL TBD and subject to change]). |
| 3. | **RE/MAX Intranet Webpage Advertising (RE/MAX Mainstreet)**<br><br>Continuously during the Term, RE/MAX will:<br><br>• RE/MAX will display Quicken Loans logos (banners or buttons) promoting Quicken Loans as the RE/MAX preferred lender on the RE/MAX Mainstreet intranet webpage (www.remax.net).<br><br>• During the first month of each calendar quarter, RE/MAX will advertise Quicken Loans on RE/MAX Mainstreet's home page in the "Approved Supplier Advertisement" section.<br><br>• Promote Quicken Loans in the RE/MAX University webpage in the following ways:<br><br>(a) RE/MAX R4 Convention broadcast (Quicken Loans presentation) will be available on-demand.<br><br>(a) RE/MAX Summer Conference broadcast (Quicken Loans presentation) will be available on-demand.<br><br>(b) Continuously promote Quicken Loans video presentations on a "Quicken Loans Channel" on the RE/MAX University Learn Page.<br><br>• Promote Quicken Loans on the "Shop" | In order to properly validate marketing responsibility 3, RE/MAX will provide certain Quicken Loans representatives access to RE/MAX Mainstreet.<br><br>• Each month, Quicken Loans will validate that Quicken Loans is advertised on the internet webpage by visiting www.remax.net.<br><br>• Each quarter, Quicken Loans will validate that Quicken Loans is advertised on the "Approved Supplier Advertisement."<br><br>• Each month, Quicken Loans will validate that Quicken Loans is being promoted in the digital formats in RE/MAX University.<br><br>• Each month, Quicken Loans will validate that Quicken Loans is being promoted on the "Shop" webpage and the dedicated webpage at www.remax.net/shop/ approvedsupplier/pages/<br><br>quickenloans.aspx (subject to URL changes, as necessary)<br><br>• Each month, Quicken Loans will validate that Quicken Loans is being promoted on the My Region page for |

| | |
|---|---|
| webpage in the following ways:<br><br>(b) Display Quicken Loans logo on a co-branded shopping tab landing page promoting all key products and services;<br><br>(c) provide a direct link to a webpage dedicated to detailing the benefits of Quicken Loans products and services;<br><br>(d) enable searches for Quicken Loans products and services on the "Shop" landing page through a key word search based on Google technology.<br><br>• Promote Quicken Loans on the My Region pages for each Company-owned region advertising Quicken Loans monthly newsletter or other advertising that promoted Quicken Loans products and services | each Company-owned regions. |
| **Affiliate Training** | **Validation** |
| **4.**  **Broker/Owner Monthly Training Class**<br>Monthly four (4) day training class for new and existing franchise owners and/or managers:<br><br>• Franchise owners must attend training class within 12 months of purchasing a RE/MAX franchise<br>RE/MAX shall market Quicken Loans in the following ways:<br><br>• Quicken Loans marketing collateral to be distributed to training class (collateral to be mutually agreed upon and furnished by Quicken Loans)<br><br>• Trainers will promote Quicken Loans by distributing Promotional Materials (i.e., a Welcome Packet, Instructional Folder, etc.) detailing the benefits of Quicken Loans products and services to attendees<br><br>• Broker/Owner training class attendee list provided to Quicken Loans | On a monthly basis, RE/MAX will provide the list of franchise owners and/or managers that attended the monthly training class. |

| Print Advertising | Validation |
|---|---|
| **5.** **The RE/MAX Collection** <br> RE/MAX shall advertise  Quicken Loans in the following two (2) print publications <br> • DuPont Registry <br>  ○ 12 issues per year <br>  ○ 80,000 + readers <br>  ○ Quicken Loans logo placement in all issues with mutually agreed tag line <br> • Unique Homes <br>  ○ 6 issues per year <br>  ○ 100,000+ readers <br>  ○ Quicken Loans logo placement in all issues with mutually agreed upon tag line | • On a monthly basis, RE/MAX will provide a copy of the DuPont Registry promoting Quicken Loans by sending it in an email to: _____ <br><br> • Every other month, RE/MAX will provide a copy of Unique Homes promoting Quicken Loans by sending it in an email to: _____ <br><br> • |

| Event Participation | Validation |
|---|---|
| **6.** **Annual RE/MAX Convention** <br> **General marketing** shall include: <br> • Prominent placement with no less than six exhibit spaces. <br> • Twenty five exhibitor name badges (additional name badges may be purchased at the then prevailing price) <br> • Registration bag insert placement (artwork and printing provided by Quicken Loans) <br> • Projected attendee list by e-mail thirty (30) days before the Convention and an actual attendee list within seven (7) days after the Convention <br> • RE/MAX to use commercially reasonable efforts to assist Quicken Loans in securing a suite or meeting room at the host hotel (at Quicken Loans expense) <br> • Signage at Convention including: <br>  ○ Meter boards <br>  ○ Directional signs <br>  ○ Registration area exposure <br>  ○ Market Place exposure | • Within seven (7) days after the Conference, RE/MAX shall provide Quicken Loans with a registration folder including the agenda and a diagram of the exhibit floor, highlighting exhibit spaces provided to Quicken Loans. <br><br> • RE/MAX will provide Quicken Loans with a copy of the actual attendee list within seven (7) days after the Conference by emailing it to: _____ <br><br> • RE/MAX will provide Quicken Loans with a description of the type and placement of signage promoting Quicken Loans at the Conference within seven (7) days after the Conference by emailing it to: _____ <br><br> • Within seven (7) days after the Conference, RE/MAX will provide Quicken Loans a copy of the videos used to promote Quicken Loans at |

| | |
|---|---|
|      ○  Gobos<br><br>• Quicken Loans to have option to purchase tickets for all convention social events at prevailing prices<br><br>**Keynote Address presented by Quicken Loans (at R4 Convention)**<br><br>**Exclusive Marketing** shall include:<br><br>• Opening Session promotion by RE/MAX Officer<br><br>• 30 second video promoting Quicken Loans (video produced by RE/MAX and approved by Quicken Loans)<br><br>• 30 second video promoting keynote address via video streaming in the Events-Convention section on RE/MAX Mainstreet (video produced by RE/MAX and approved by Quicken Loans)<br><br>• 15 second welcome video from a Quicken Loans Officer, production furnished by Quicken Loans, script to be mutually agreed upon<br><br>• Quicken Loans ad in pocket agenda (artwork provided by Quicken Loans)<br><br>• Quicken Loans logo in conference marketing brochure<br><br>• Twenty five admission tickets for the Welcome Reception<br><br>**One Hour Educational Session** hosted by Quicken Loans with rotating topic to be approved by RE/MAX and filmed by RE/MAX University | Opening General Session as well as a copy of the Keynote Address video.<br><br>• Within seven (7) days after the Conference, RE/MAX will provide Quicken Loans a copy of the Quicken Loans hosted Educational Session video. |
| **7.**   **Annual RE/MAX, LLC Summer Conference for Broker/Owners and Managers**<br>**General marketing** shall include:<br><br>• Prominent placement of two exhibit spaces (additional exhibit spaces may be purchased at the then prevailing price)<br><br>• Twenty five exhibitor name badges (additional name badges may be purchased at the then prevailing price)<br><br>• Registration bag insert placement (artwork and printing provided by Quicken Loans)<br><br>• RE/MAX to use commercially reasonable efforts in securing a suite or meeting room at the host hotel (at Quicken Loans expense)<br><br>• Signage at Conference (subject to availability) | • Within seven (7) days after the Convention, RE/MAX shall provide Quicken Loans with a registration folder including the agenda and a diagram of the exhibit floor, highlighting exhibit spaces provided to Quicken Loans.<br><br>• RE/MAX will provide Quicken Loans with a copy of the actual attendee list within seven (7) days after the Convention by emailing it to:<br><br>_____<br><br>• RE/MAX will provide Quicken Loans with a description of the type and placement of signage promoting |

<table>
<tr>
<td colspan="2">

including:

- o Meter boards
- o Directional signs
- o Registration area exposure
- o Market Place exposure
- o Gobos

• Quicken Loans to have option to purchase tickets for all convention social events at prevailing prices

**Keynote Address presented by Quicken Loans (at Broker/Owner Conference)**

**Exclusive Marketing** shall include:

• Opening Session promotion by RE/MAX Officer

• 30 second video promoting Quicken Loans (video produced by RE/MAX and approved by Quicken Loans)

• 30 second video promoting keynote address via video streaming in the Events--Conventions section on RE/MAX Mainstreet (video produced by RE/MAX and approved by Quicken Loans)

• 15 second welcome video from a Quicken Loans Officer, production furnished by Quicken Loans, script to be mutually agreed upon

• Quicken Loans ad in pocket agenda (artwork provided by Quicken Loans)

• Quicken Loans logo in conference marketing brochure

• Twenty five admission tickets for the Welcome Reception

**One Hour Educational Session** hosted by Quicken Loans with rotating topic to be approved by RE/MAX and filmed by RE/MAX University
</td>
<td>

Quicken Loans at the Convention within seven (7) days after the Convention by emailing it to: _____

• Within seven (7) days after the Convention, RE/MAX will provide Quicken Loans a copy of the videos used to promote Quicken Loans at Opening General Session as well as a copy of the Keynote Address video.

• Within seven (7) days after the Convention, RE/MAX will provide Quicken Loans a copy of the Quicken Loans hosted Educational Session video.
</td>
</tr>
<tr>
<td>8.</td>
<td>

**Regional Events.** Each year, RE/MAX shall invite Quicken Loans representative(s) to attend and participate in at least two events attended by Affiliates and/or Agents annually in each of the Company-owned Regions.
</td>
<td>

Within seven (7) days after a Regional Event, RE/MAX shall provide Quicken Loans with a registration folder or agenda (or any similar documentation) evidencing Quicken Loans participation. RE/MAX shall also email a copy of its invitation(s) to Quicken Loans representatives to: BusinessDevelopment-AgentRelations@quickenloans.com
</td>
</tr>
</table>

E-5

**Exhibit F**

**Non-Disclosure Agreement**

CONFIDENTIAL

## NON-DISCLOSURE AGREEMENT

This Non-disclosure Agreement ("Agreement") is entered into as of the Effective Date (below) by and between the undersigned parties (the "Parties"). It is understood between the Parties that this Agreement shall survive for the "Term" identified in Section II(10), below.

## I. DEFINITIONS

As used in this Agreement:

"**Affiliate**" is any person, partnership, joint venture, corporation or other form of enterprise, domestic or foreign, including but not limited to parents, subsidiaries, that directly or indirectly, control, is/are controlled by, or are under common control with a Party.

"**Party(ies)**" are the Party-signatories to this Agreement and includes all Affiliates, employees and agents of that Party, unless otherwise indicated in this Agreement.

"**Confidential Information**" means non-public information and related materials (whether written or oral) that a Party to this Agreement (the "Disclosing Party") designates in writing as being confidential, proprietary or personal information to the Party that receives such information (the "Receiving Party") or which, under the circumstances surrounding disclosure ought to be treated as confidential and/or proprietary by the Receiving Party. Proprietary Information and Personal Information shall be collectively called "Confidential Information". Confidential Information also includes information regarding the circumstances under which the Parties have agreed to exchange information under this Agreement.

"**Proprietary Information**" includes, without limitation, information disclosed during the term of this Agreement in tangible or intangible form relating to the Disclosing Party's: request for proposals, financial statements, and balance sheets; banking information; the terms of any warehouse and/or other lines of credit, repurchase agreements, loan purchase & sale agreement; information disclosed in any credit application financial data including costs, expenses and margins; audit reports, credit, accounting, and marketing information, data, statements and reports; loan files; individual and aggregate loan data, loan underwriting information, servicing data, origination data, pricing information, and loan sales data; employee and vendor information and lists; customer information and customer lists; price lists and pricing policies and plans; hedging policies, methodologies, and plans; research, ideas, inventions, and concepts; engineering or technical expertise; designs, drawings, diagrams, flow charts, schematics, and specifications; methods, techniques, processes and procedures; computer hardware, peripherals, telecom, voice and data networks and network systems and devices, software products, including software in various stages of development and design; business plans, marketing plans, analysis, compilations, summaries, forecasts, predictions, and projections; web-related data including web performance, hits, visits and conversion ratios; intellectual property, trade secrets and know-how.

"**Personal Information**" includes any "nonpublic personal information" as that term is defined in Title V of the Gramm-Leach-Bliley Act of 1999 or any successor federal statute, and the rules and regulations thereunder, all as may be amended or supplemented from time to time ("GLBA") and personally identifiable information protected under any other applicable laws, rule or regulation of any jurisdiction relating to disclosure or use of personal information ("Privacy Laws").

"**Purpose of the Disclosure**" means to facilitate discussions about, and the evaluation of, a potential business relationship between the Parties. In the event that the Parties enter into a business relationship, the "Purpose of the Disclosure" shall be broadened to include the lawful sharing of Confidential Information for the purposes set forth in any subsequent agreements, entered into in writing, between the Parties.

CONFIDENTIAL

## II.  THE PARTIES HEREBY AGREE AS FOLLOWS:

1.  Property of the Disclosing Party.  All right, title and interest in and to the Confidential Information (including all information created or stored on, deleted from and/or sent through the Disclosing Party's technology systems including but not limited to telecom, email, Internet, Intranet, desktop computers, network systems and related systems) will be and remain vested in the Disclosing Party.

Nothing in this Agreement will grant the Receiving Party any patent, copyright, trademark, mask work, trade secret, license or right of any kind with respect to the Confidential Information, other than to review and evaluate such information for the Purpose of the Disclosure set forth above. Unless otherwise stated, all Confidential Information is provided on an "AS IS" basis; and all representations and warranties, express or implied, are hereby disclaimed.

The Disclosing Party represents and warrants that all Confidential Information disclosed or otherwise provided to the Receiving Party has been lawfully obtained (e.g. not obtained through fraud, identity theft or any illegal or illicit means) and that the Disclosing Party has the legal right to disclose such Confidential Information.

2.  The Receiving Party's Obligations.

(A) The Receiving Party agrees:

(i) it will not disclose any Confidential Information to third parties except as to those third party business associates and consultants who have a need to know and have also agreed in writing to maintain the confidential status of the Confidential Information and restrict its use in accordance with all the terms of this Agreement; will not use the Confidential Information for a purpose other than for the stated Purpose of the Disclosure; and will not copy such information for a purpose other than for the stated Purpose of the Disclosure;

(ii) in the event that the Receiving Party has access (local or remote) to the Disclosing Party's technology systems, including but not limited to telecom, email, Internet, Intranet, desktop computers, network systems, etc., the Receiving Party will exercise commercially reasonable care in transmitting any Confidential Information via these systems;

(iii) to employ commercially reasonable security precautions and efforts (such precautions and efforts to be at least as secure as the precautions and efforts the Receiving Party takes to protect its own Confidential Information, but in any event, no less than reasonable care) to safeguard the secrecy and confidentiality of the Confidential Information, and to prevent unauthorized access, reproduction, disclosure, and/or use of any of the Confidential Information, other than for the Purpose of the Disclosure and then only in compliance with this Agreement and subject to any applicable laws;

(iv) to disclose the Confidential Information only to those officers, directors, employees, consultants and advisors of the Receiving Party who need to know such information in order to carry out the Purpose of the Disclosure who are under the control of the Receiving Party and who are apprised that disclosure of such Confidential Information is made pursuant to and subject to this Agreement; and in the event the employment or engagement of any such person is terminated, the Receiving Party agrees to use its best efforts to recover any Confidential Information in such person's possession, custody or control;

(v) it will not remove any copyright notice, trademark notice, confidential and/or other proprietary legend or indication of confidentiality set forth on or contained in any of the Confidential Information;

(vi) not to disassemble or decompile software, or otherwise attempt to reverse engineer the design and function of any of the Confidential Information, nor will it develop, manufacture, produce, and/or distribute any software product or business system derived from or which otherwise uses any of the Confidential Information;

(vii) to promptly notify the Disclosing Party in writing, of each instance involving the unauthorized use, access, disclosure, misuse, alteration, destruction or other compromise of the Confidential Information, including a detailed description of the circumstances and the parties involved;

CONFIDENTIAL

(viii) in the event that the Receiving Party is required to disclose any portion of the Disclosing Party's Confidential Information by applicable law, regulation, court order, legal process, or at the request of any governmental agency having supervisory authority over the Disclosing Party (provided such agency is under a general or specific obligation to maintain the confidentiality of such disclosures as a matter of law, regulation or otherwise), the Receiving Party may do so, provided the Receiving Party will use its best efforts to notify the Disclosing Party in writing (unless prohibited from doing so by the terms of the law, regulation, court order, legal process or request of the supervisory agency) so that the Disclosing Party can seek a suitable protective order, and the Receiving Party will provide commercially reasonable cooperation and assistance to the Disclosing Party;

(ix) to implement and maintain safeguards for all Personal Information received from the Disclosing Party, as required by all applicable laws and/or regulations, including the Gramm-Leach-Bliley Act; and

(x) to defend, indemnify and hold the Disclosing Party harmless from all claims, liabilities, damages, or judgments involving a third party, including the Disclosing Party's costs and attorney's fees, which arise as a result of the Receiving Party's failure to meet its obligations under this Agreement. Each party's indemnification obligations pursuant to this Section 2(a)(x) shall be subject to the indemnified party (i) notifying the indemnifying party promptly in writing of any third party claim for which indemnification may be sought, (ii) giving the indemnifying party exclusive control and authority over the defense and settlement of such claim, (iii) not entering into any settlement or compromise of any such claim without the indemnifying party's prior written consent and (iv) providing all reasonable assistance to the indemnifying party (provided that the indemnifying party reimburses the indemnified party for its out-of-pocket expenses incurred in providing such assistance). It is acknowledged and agreed that the foregoing indemnification obligation also includes a duty to fully reimburse the Disclosing Party for all security breach notification costs and expenses that may be awarded by a court of law in the event that Personal Information is unlawfully disseminated due to a failure of the Receiving Party's safeguards.

(B) Notwithstanding the provisions of Section II(2)(A) above, the Receiving Party has no obligation to maintain the confidentiality of any Confidential Information which: (a) the Receiving Party can demonstrate was known by the Receiving Party prior to the disclosure by the Disclosing Party; (b) properly came into the possession of the Receiving Party from a third party which was not under any obligation to maintain the confidentiality of such information; (c) has become part of the public domain through no act or fault on the part of the Receiving Party in breach of this Agreement; (d) the Receiving Party can demonstrate was independently developed by or for the Receiving Party without the use of Confidential Information, or (e) the information was communicated to the Receiving Party in documentary form by a third party lawfully in possession of such information and not subject to a contractual or fiduciary obligation of confidentiality respecting such information.

3. Competition. Neither Party has an obligation under this Agreement to enter into any other agreement with the other Party. Nothing in this Agreement will prohibit or restrict either Party's right to develop, use, or market products or services similar to or competitive with those of the other Party disclosed in the Confidential Information as long as it will not thereby breach this Agreement. Additionally, each Party acknowledges that the other may already possess or have developed products or services similar to or competitive with those of the other Party to be disclosed in the Confidential Information.

4. Equitable Relief. The Receiving Party agrees that any unauthorized use of the Confidential Information by the Receiving Party may cause the Disclosing Party irreparable harm for which its remedies at law would be inadequate. Therefore, in addition to any other rights it may have at law, the Disclosing Party will be entitled to seek equitable relief.

5. General. This Agreement constitutes the complete and exclusive agreement and understanding between the Parties with respect to the Confidential Information, and supersedes all prior and contemporaneous negotiations, discussions and understandings of the Parties, whether written or oral with respect to this subject matter. Notwithstanding, in the event of any conflict between the terms and conditions of this Agreement and any other document or agreement between the Parties (now or in the future) pertaining to the purposes contemplated by this Agreement, the terms and conditions of the agreement that is more limiting, restraining and restrictive will prevail

**CONFIDENTIAL**

with respect to the protection and non-disclosure of Confidential Information.

No statement in writing subsequent to the date of this Agreement purporting to modify or add to the terms and conditions will be binding unless consented to in writing by duly authorized representatives of each Party in a document making specific reference to this Agreement. This Agreement and the Confidential Information will not be assigned, sold or disposed of by either Party in any manner without the Disclosing Party's prior written consent and any attempted or purported assignment of this Agreement or the Confidential Information (by way of merger, or sale of operations, or otherwise) without the Disclosing Party's consent will be prohibited and void. The relationship of the Parties created by this Agreement is that of independent parties and not that of employer/employee, principal/agent, partnership, joint venture or representative of the other. Neither Party will represent to third parties that it is the representative of the other in any manner or capacity whatsoever.

All notices or other communications contemplated by this Agreement shall be in writing and shall be deemed duly delivered (i) when delivered personally, (ii) one day after deposit for next day delivery with a nationally recognized overnight courier service with tracking capabilities, or (iii) on the actual date of delivery after mailing by registered or certified mail, postage prepaid, to the address of the other Party set forth in this Agreement or such other address as a Party may by notice specify to the other Party.

6. Solicitation of Employees. Each party agrees that for a period of two years from and after the Effective Date of this Agreement it shall not directly solicit for employment any current director, officer and/or employee of the other party (or any director, officer and/or employee who becomes employed by the other party during the term of this Agreement). Employment advertisements aimed at a broad, general audience shall not constitute prohibited solicitation, provided they are not targeted to or at the other Party. The Receiving Party agrees that for a period of two years from and after the Effective Date of this Agreement, the Receiving Party shall not employ any employee of the Disclosing Party (or any employee who is or was employed by the Disclosing Party as of the Effective Date or employed by the Disclosing Party at any time during the term of this Agreement) with whom the Receiving Party came in contact or communicated with, or about whom the Receiving Party obtained or was provided information, in connection with any disclosures made pursuant to this Agreement. The foregoing shall not alter or supersede the terms of any employment agreement between a Party and its employees.

7. Return of Confidential Information. Upon termination, expiration or the Disclosing Party's written request, the Receiving Party shall, in its discretion, return or permanently and completely destroy, the Disclosing Party's Confidential Information. Notwithstanding the foregoing, the Receiving Party may retain copies of such Confidential Information as required by applicable law, and, to the extent such copies are electronically stored in accordance with the Receiving Party's retention or back-up policies or procedures (including, without limitation, those regarding electronic communications), so long as such Confidential Information is kept confidential as required under this Agreement.

8. Choice of Law. This Agreement will be governed by and construed in accordance with the laws of the State of Michigan without giving effect to choice of law principles. The parties agree that Michigan is a reasonably convenient place for the trial of cases arising under this contract. Agreement to Michigan as the forum for litigation was not obtained by misrepresentation, duress, the abuse of economic power, or other unconscionable means. Should any provision of this Agreement be determined to be void, invalid or otherwise unenforceable by any court of competent jurisdiction, such determination will not affect the remaining provisions hereof which will remain in full force and effect. No action arising out of this Agreement, regardless of form, may be brought by either Party more than one (1) year after the cause of action has accrued. The prevailing Party, in part or in whole, in any legal or equitable action to enforce this Agreement will be entitled to recover all court costs and attorney fees incurred before and at trial, as well as at all levels of proceedings.

9. Authority. The undersigned acknowledge and agree that they have the authority to enter into this agreement and hereby bind their respective Party and any Party Affiliates who obtain Confidential Information.

10. Term. The term of this Agreement will be 3 years and the Receiving Party's obligations with respect to non-disclosure and non-use of the Confidential Proprietary Information will terminate 3 years from the Effective Date of this Agreement. Notwithstanding, if Personal Information is shared between the parties, the Receiving Party's obligations will survive indefinitely as required by law or until such Personal Information is permanently destroyed. Further, the Receiving Party's obligation to protect the Disclosing Party's trade secrets will remain until an event set

CONFIDENTIAL

forth in Section II(2)(B) occurs.

11. Counterparts. This Agreement may be executed in counterparts each of which shall constitute one and the same instrument, and either party may execute this Agreement by signing any such counterpart. The exchange of copies of this Agreement and of signature pages by facsimile or .pdf transmission shall constitute effective execution and delivery of this Agreement and may be used in lieu of an original for all purposes.

This Agreement will be effective as of: February 13, 2014 ("Effective Date").

Acknowledged and agreed:

QUICKEN LOANS INC.

Signature

Name: Grant Sylvester

Title: Contract Specialist

Address:  1050 Woodward Avenue
          Detroit, MI 48226

RE/MAX, LLC
Company Name

Signature

Name: Michael P. Ryan

Title: EVP

Address: 5075 S. Syracuse St
         Denver CO 80237

Case 1:16-cv-02696-RM-NYW   Document 3   Filed 11/01/16   USDC Colorado   Page 50 of 58
Case 2:17-mc-50617-DML-RSW   ECF No. 1-3   PageID.93   Filed 05/01/17   Page 51 of 59
1:16-cv-19233-DML-RSW   Doc No. 1-3   Filed 09/09/16   Pg 1 of 9   Pg ID 50

# EXHIBIT B

Case 2:17-mc-50617-DML-RSW   ECF No. 1-3, PageID.94   Filed 05/01/17   Page 52 of 59

Case 1:16-cv-02695-RM-NYW   Document 3   Filed 11/01/16   USDC Colorado   Page 51 of 58
2:16-cv-13233-DML-RSW   Doc # 1-3   Filed 09/07/16   Pg 2 of 5   Pg ID 51

**DRAFT: Overview - QL & RM**                                   as of      9/22/2015

Draft Analysis of Services provided by RE/MAX, LLC to Quicken Loans

Existing Contractual Items

| | RE/MAX Marketing Service | Description | Starting Assumptions | Assumption Descriptor | Est. Penetration Rate | Est. Avg. Annual Activity | Est. Avg. Monthly Activity | Source | |
|---|---|---|---|---|---|---|---|---|---|
| **1 Website (Consumer audience)** | | | | | | | | | |
| 1a | Home Page Attribution | -RM to display QL logo on remax.com main homepage | 51,000,000 | Site Visits per year | 100% | 51,000,000 | 4,250,000 | Site Visit Counts from last 12 months | https://www.dropbox.com/s/rbhd3ykqqkta92d/Qq40q.pdf?dl=0 |
| 1b | Dedicated Page (Mortgage Page) | -RM to feature QL in the Mortgage Tools Section of remax.com | 51,000,000 | Site Visits per year | 50% | 25,500,000 | 2,125,000 | Site Visit Counts from last 12 months | https://www.dropbox.com/s/rbhd3ykqqkta92d/Qq40q.pdf?dl=0 |
| 1c | Links, Logo and Calculator Attributes (desktop) | -RM to provide QL logos (banners or buttons) or links to promote QL as provider of mortgage tools on each property listing page (may include calculator widget) | 124,503,000 | Desktop Page views of listing pages per year | 90% | 112,052,700 | 9,337,725 | Pageview counts for desktop - previous 12 months | https://www.dropbox.com/s/31vb1jy0dhfnh7f/pageviews_Desktop.pdf?dl=0 |
| 1d | Links, Logo and Calculator Attributes (mobile) | -RM to provide QL logos (banners or buttons) or links to promote QL as provider of mortgage tools on each property listing page (may include calculator widget) | 84,005,000 | Mobile Page views of listing pages per year | 90% | 75,604,500 | 6,300,375 | Pageview counts for mobile - previous 12 months | https://www.dropbox.com/s/7bks7oor6a92xe/PageViews_Mobile.pdf?dl=0 |
| 1e | RE/MAX Collection | -RM to display QL logo and a link to QL Online Mortgage Center on the RM Collection webpage | 94,800 | Site Visits per year | 100% | 94,800 | 7,900 | Total Sessions month over month from July | https://www.dropbox.com/s/7bs14yr1b94j9z1/Collection%0atcox.pdf?dl=0 |
| **2 Intranet (Agent audience)** | | | | | | | | | |
| 2a | Mainstreet Home Page Display | -RM will display QL logos (Banners or buttons) promoting QL as the RM preferred lender on remax.net (intranet page) | 3,084,120 | Total annual sessions | 100% | 3,084,120 | 257,010 | Total annual session count based on July 2015 eMetrics report | https://www.dropbox.com/s/7olaqz5tq1pzdo5/Mainstreet%0atcox.pdf?dl=0 |
| 2b | Premier Approved | -Approved Supplier Advertisement on remax.net -Convention broadcast on-demand -Video presentations on QL channel -Availability on the "Shop" tab with additional descriptors -Unique page outlining QL Benefits -Searches enabled for QL -QL promoted in the 'MyRegion' section | 3,084,120 | Total annual sessions | 50% | 1,542,060 | 128,505 | Total annual session count based on July 2015 eMetrics report | https://www.dropbox.com/s/0z6efskkrtxvbjh/MyRegion%0atcox.pdf?dl=0 |

| | RE/MAX Marketing Service | Description | Starting Assumptions | Assumption Descriptor | Est. Penetration Rate | Est. Avg. Annual Activity | Est. Avg. Monthly Activity | | Source |
|---|---|---|---|---|---|---|---|---|---|
| **3 Campaigns (Agent audience)** | | | | | | | | | |
| 3a | Newsletter | -Monthly Newsletter to each company owned region | 696,000 | annual impressions | 100% | 696,000 | 58,000 | | See Exhibit E, Section 3 - last bullet |
| 3b | Email | -Promotion of QL products and services in broker/agent weekly email newsletters | 2,784,000 | annual impressions (4 emails/mo to all US Affiliates) | 100% | 2,784,000 | 232,000 | | -Monthly emails x4 |
| 3c | Direct Mail | -QL response to request for additional information. 100% QL Content / Value prop and call to additional action | 696,000 | annual impressions | 100% | 696,000 | 58,000 | | -See previous Mlink report - no changes here |
| **4 Direct Interaction (Agent audience)** | | | | | | | - | | |
| 4a | Affiliate Training | -Monthly 4 day training class for new franchise owners<br>-QL Collateral distributed to trainees<br>-Trainers to promote QL<br>-Data provided to QL. | 10,440 | Total brokerage and agent impressions based on 29 agents/office from initial broker attendee | 100% | 10,440 | 870 | -Training will be made available to all agents/brokers... this number only assumes Agents - materials provided for each office X 29agents/office | Affiliate list provided to QL post training |
| | Conferences (2 Annual Conferences) | | | | | | - | | |
| 4b | > exhibition space | -Prominent placement of exhibit space at entrance to exhibit hall<br>-Name badges | 49,584 | Agents & Brokers | 50% | 24,792 | 2,066 | -Attendees per conference:<br>-R4: 8,000 attendees<br>-Broker/Owner: 1,000 attendees<br>-All global (100,000) affiliates are notified of each conference through various marketing channels.<br>-Follow up of OGS, and marketing materials avail. For all RM Affiliates post conference | Conference Attendee list provided to QL following each conference |
| 4c | > advertising, signage, sponsorship | -Bag inserts (artwork and printing)<br>-Meeting Rooms<br>-Signage: Meter boards, directional signs, registration area exposure<br>-MarketPlace exposure<br>-Keynote Address presented by QL<br>-QL logo in conference marketing brochure to all RM Affiliates | 49,584 | Agents & Brokers | 50% | 24,792 | 2,066 | -Attendees per conference:<br>-R4: 8,000 attendees<br>-Broker/Owner: 1,000 attendees<br>-All global (100,000) affiliates are notified of each conference through various marketing channels.<br>-Follow up of OGS, and marketing materials avail. For all RM Affiliates post conference | Conference Attendee list provided to QL following each conference |

| | RE/MAX Marketing Service | Description | Starting Assumptions | Assumption Descriptor | Est. Penetration Rate | Est. Avg. Annual Activity | Est. Avg. Monthly Activity | Source |
|---|---|---|---|---|---|---|---|---|
| 4d | > education sessions | -One Hour educational session hosted by QL with rotating topic<br>-QL Logo in marketing brochure to all RM Associates | 12,384 | Agents & Brokers in attendance | 25% | 3,096 | 258 | -Attendees per conference:<br>-R4: 8,000 attendees<br>-Broker/Owner: 1,000 attendees<br>-All affiliates are notified of each conference through various marketing channels | Conference Attendee list provided to QL following each conference |
| 4e | Regional Conferences | -Two events in each of the Company Owned Regions. | 38,400 | Agents & Brokers in attendance | 100% | 38,400 | 3,200 | -Anticipated conference attendance | Conference Attendee list provided to QL following each conference |
| **5 Print Materials (Agent & Consumer audience)** | | | | | | | | |
| 5a | DuPont Registry Advertisement (Monthly - Published Edition) | -DuPont Registry promotion<br>-12 issues/yr<br>-QL Logo placement in all issues | 960,000 | Impressions/Yr | 100% | 960,000 | 80,000 | See Exhibit E - Section 5 |
| 5b | DuPont Registry Advertisement (Monthly - Online/Digital Addition) | -DuPont Registry promotion<br>-12 issues/yr<br>-QL Logo placement in all issues | 2,400,000 | Impressions/Yr | 100% | 2,400,000 | 200,000 | See Exhibit E - Section 5 |
| 5c | Unique Homes Advertisement (Bi-Monthly - Published Edition) | -Unique Homes promotion<br>-6 issues per year<br>-QL Logo placement in all issues | 1,200,000 | Impressions/Yr | 100% | 1,200,000 | 100,000 | See Exhibit E - Section 5 |
| 5d | Unique Homes Advertisement (Bi-Monthly - Online/Digital Addition) | -Unique Homes promotion<br>-6 issues per year<br>-QL Logo placement in all issues | 2,000,000 | Impressions/Yr | 100% | 2,000,000 | 166,667 | See Exhibit E - Section 5 |
| 5e | Distribution of collateral to RM Offices | -Issues of each magazine provided to all RM affiliates per year | 58,000 | Total US RM Affiliate count | 50% | 29,000 | 2,417 | See Exhibit E - Section 5 |
| **6 Other** | | | | | | | | |
| 6a | Designated Account Representative & Executive Producer | -Production studio producer for annual coordination of studio shoots and production, promotion placement of QL throughout network | 1 | Fixed Cost | 100% | 1 | 0.08 | $100,000 per year for production studio |
| 6b | Press Release With QL Attribution | -Attribution of QL within 1 annual press release | 41,000,000 | Audience Impressions | 50% | 20,500,000 | 1,708,333 | -From the average of the first 14 national press releases from RM from 2015. | STANDARD METHODOLOGY:<br>-Websites: Five day avg. visits<br>-Newspapers: Subscription Base<br>-Radio/TV: Audience projection for half hour<br>-NOTE: no arbitrary multiples used |
| 6c | Data Feeds | -Monthly data feeds on RM Roster changes<br>-Data feeds on listing and sales volume data | | -Agent roster info<br>-Listing information | | | | -Assume comparable would be purchase of license feed of all RM Agents as well as all RM listing data (approx. 100,000 agents and 400,000 listings/yr) |

| | RE/MAX Marketing Service | Description | Starting Assumptions | Assumption Descriptor | Est. Penetration Rate | Est. Avg. Annual Activity | Est. Avg. Monthly Activity | Source |
|---|---|---|---|---|---|---|---|---|
| 6d | Use of RE/MAX marks | -Ability for QL to use approved supplier logo<br>-Ability for QL to use other RM marks across QL publications<br>-Ability to use remax in post-domain path of URL (eg www.quickenloans.com/remax) | | TBD based on use | | | | |

# EXHIBIT C

## FIRST AMENDMENT TO STRATEGIC MARKETING ALLIANCE AGREEMENT

## QUICKEN LOANS, INC. AND RE/MAX, LLC

First Amendment (the "Amendment"), dated November 10, 2015 (the "Amendment Date") to the Strategic Marketing Agreement, with an effective date of October 15, 2015 (as amended, supplemented or otherwise modified from time to time, the "Agreement") by and between Quicken Loans, Inc. ("Quicken Loans"), and RE/MAX, LLC ("RE/MAX").

WHEREAS, Quicken Loans and RE/MAX are parties to the Agreement; and

WHEREAS, Quicken Loans and RE/MAX wish to make certain amendments to the Agreement.

NOW THEREFORE, in consideration of the mutual agreements contained herein, the parties agree as follows:

1. **Amendments to the Agreement:**

The Agreement is amended as follows:

(a) Section 1 is amended to delete the definition of the term "Leads".

(b) Section 1 is further amended to delete the definition of Residential Mortgages and replace it with the following:

"**Residential Mortgages**" shall mean residential mortgages for owner-occupied homes.

(c) Section 2.2 is hereby amended and restated in its entirety as follows:

**2.2**     **Official Residential Mortgage Provider.**   RE/MAX hereby designates Quicken Loans as "official residential mortgage provider".

(d) Section 2.6 is hereby amended to add the following sentence at the end of such section: "The template for Quicken Loans attribution in the RE/MAX National Housing Report shall be subject to approval by Quicken Loans; however, the distribution of each edition of the RE/MAX National Housing Report by RE/MAX shall not be subject to this Section 2.6."

(e) Sections 4.1(a)(ii) and Section 4.1(a)(iii) of the Agreement are each hereby amended to replace the phrase "the exclusive Residential Mortgages" with "a".

(f) Section 4.2 is hereby amended to add the following sentence at the end of such section: "This Agreement is non-exclusive. Except as otherwise required by this Agreement, the parties may engage in similar activities with other parties."

(g) Section 5(f) is hereby deleted and replaced with "[Reserved]".

(h) The first paragraph of Section 6 is hereby amended and restated in its entirety as follows:

Throughout the Term of this Agreement, RE/MAX agrees to use commercially reasonable efforts, in compliance with all applicable laws and regulations, to promote Quicken Loans as "official residential mortgage" provider to RE/MAX Affiliates, to provide the necessary facilities and services for Quicken Loans to market and promote the Goods and Services to RE/MAX Affiliates and to perform the activities set forth in

Section 6 of this Agreement and Exhibit E, as such may be amended from time to time by mutual consent of the Parties.

(i) Section 10.4(b) is hereby amended and restated in its entirety as follows:

Either Party may terminate this Agreement without cause or default by giving notice to the other Party no later than January 31, 2018 and, if such termination notice is given, termination shall be effective April 30, 2018.

(j) Exhibit E, Section 1 is hereby amended to add the following phrase at the end of such section: "and the RE/MAX mobile site."

(k) The first bullet point under Section 3 of Exhibit E is hereby amended and restated as follows:

RE/MAX will display Quicken Loans logos (banners or buttons) promoting Quicken Loans as "official residential mortgage provider" on the RE/MAX Mainstreet intranet webpage (www.remax.net).

(l) Exhibit E, the first sentence of Section 5 hereby amended and restated in its entirety as follows: "RE/MAX shall advertise Quicken Loans in the following two (2) print publications, inclusive of online/digital display online"

(m) Exhibit E, Section 8 is hereby deleted and replaced with the following:

| Additional Marketing Benefits | Validation |
|---|---|
| 8. Attribution to Quicken Loans on the RE/MAX National Housing Report and make the report available for public distribution at least twelve times per year. | • Within twenty-five (25) days after the disbursement of a RE/MAX National Housing Report, RE/MAX will provide to Quicken Loans a report on the potential audience size for distribution. |
| 9. Good faith effort to implement Pixel Placement on remax.com | • By December 31, 2015 |
| 10. Good faith effort to implement on remax.com the ability for consumers to request (via a Check Box or similar means) information on pre-approval from Quicken Loans. | • By March 31, 2016 |
| 11. Good faith effort to implement Digital Quicken Loans Ad Placements or attribution on RE/MAX owned mobile app. | • By December 31, 2015 |
| 12. Good faith effort to implement Quicken Loans Sponsored Listing Videos to remax.com | • By March 31, 2016 |

## 2. Reference to and Effect on the Agreement

(a) Each reference in the Agreement to the "Agreement" and use of terms such as "hereunder," "hereof," "herein" shall mean and be a reference to the Agreement as amended by this Amendment.

*First Amendment to Strategic Marketing Alliance Agreement*

(b) Except as specifically amended above, the Agreement is and shall continue to be in full force and effect and is hereby ratified and confirmed.

(c) All terms used but not defined herein shall have the meaning ascribed to such term in the Agreement.

## 3. Execution in Counterparts

This Amendment may be executed by the parties in any separate counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which taken together shall constitute but one and the same agreement.

IN WITNESS WHEREOF, the parties have executed this Amendment as of the Amendment Date.

QUICKEN LOANS, INC.

By: Jay D. Farner
Title: President + CMO
Date: 11.11.15

RE/MAX, LLC

By: Michael Ryan
Executive Vice President
Date: